Per curiam.
We have before us a subsequent application for a writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure Article 11.071 § 5 and a motion to stay applicant's execution.[1]
In December 2000, a jury found applicant guilty of the 1999 capital murder of Carol Hall. The jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure Article 37.071, and the trial court, accordingly, set applicant's punishment at death. This Court affirmed applicant's conviction and sentence on direct appeal. Rayford v. State , 125 S.W.3d 521 (Tex. Crim. App. 2003).
Applicant raised twelve allegations in his initial application for a writ of habeas corpus, including allegations that: the State sponsored false testimony, his trial counsel rendered ineffective assistance of counsel; his appellate counsel rendered ineffective assistance; the trial court violated his right to present mitigating evidence; he was denied his right to remain silent; and the Eighth Amendment barred the execution of mentally ill persons like himself. This Court adopted the trial court's findings of fact and conclusions of law and denied relief on applicant's claims. Ex parte Rayford , No. WR-63,201-01, 2006 WL 1413533 (Tex. Crim. App. May 24, 2006) (not designated for publication).
On January 19, 2018, applicant filed the instant application in the trial court. This is applicant's first subsequent writ of habeas corpus application. Applicant raises five claims in his application. Specifically, he asserts that
(1) his due process rights were violated when a State's witness presented false testimony encouraging the jury to consider his race when determining whether he was a future danger;
(2) he was denied his Sixth Amendment right to the effective assistance of counsel at sentencing when his trial attorney elicited testimony linking race to dangerousness;
(3) he was denied the effective assistance of counsel because his trial attorneys failed to investigate and present available mitigation evidence that he has brain damage from lead poisoning ;
(4) he was denied the effective assistance of counsel because his trial attorneys failed to investigate and present available evidence that he did not kidnap Ms. Hall; and
(5) executing him after seventeen years on death row, and nearly twenty *919 years after the crime, violates the Eighth Amendment.
After reviewing applicant's writ application, we find that he has failed to satisfy the requirements of Article 11.071 § 5. Accordingly, we dismiss the application as an abuse of the writ without reviewing the merits of the claims, and we deny his motion to stay his execution. Art. 11.071 § 5(c).
IT IS SO ORDERED THIS THE 26th DAY OF JANUARY, 2018.
Hervey, J., filed a concurring opinion in which Keller, P.J., Keasler, and Newell, JJ., joined.
I join the Court's order dismissing Rayford's first subsequent application for habeas corpus relief and denying his motion for a stay of his execution. I write separately to provide some context regarding his claims that his race was used as a factor in deciding whether he would be a future danger. The Court properly rejects Rayford's claim because his case is distinguishable from the recent decision of Buck v. Davis , --- U.S. ----, 137 S.Ct. 759, 197 L.Ed.2d 1 (2017), by the United States Supreme Court.
Section 5
The dissent argues that the Court should file and set Rayford's subsequent writ application to determine whether Buck , 137 S.Ct. at 759, constitutes a new legal basis, but I conclude that it does not.
To satisfy the Section 5 subsequent-writ bar, an applicant must allege a new factual or legal basis. TEX. CODE CRIM. PROC. art 11.071 § 5(a)(1). When the issue is whether there is a new legal basis, the applicant must show both that the legal basis for the claim was not already recognized when the subsequent writ application was filed and that, if it was not recognized, the claim also could not have been reasonably formulated from the jurisprudence of the United States Supreme Court, federal circuit courts of appeals, or Texas appellate courts. Id. The problem with Rayford's claim is that it could have been reasonably formulated before Buck was decided; thus, as a result, and pursuant to Section 5, this Court is procedurally barred from considering the merits of his subsequent writ application.
Buck's claim is one of several that involved Dr. Quijano testifying specifically that some minorities are more likely to be a danger in the future. Buck's claim was based upon Saldano , an earlier case involving Quijano. See, e.g. , Saldano v. State , 70 S.W.3d 873 (Tex. Crim. App. 2002). In Saldano , Quijano testified that, as a Hispanic, Saldano was more likely to be a future danger. Saldano appealed Quijano's injection of race as a factor in determining his future dangerousness, and the case eventually wound up at the United States Supreme Court. Before the Supreme Court, the Texas Attorney General confessed error and asked the Supreme Court to vacate the judgment and to remand the cause because of Quijano's testimony, which the Court did. Buck , 137 S.Ct. at 770 ; Saldano v. Texas , 530 U.S. 1212, 120 S.Ct. 2214, 147 L.Ed.2d 246 (2000). Subsequently, other defendants were also granted relief on the basis of similar testimony from Quijano. Buck , 137 S.Ct. at 770 (collecting cases).
When Buck was before the United States Supreme Court, he argued that his case should be controlled by Saldano , even though it was in a different procedural posture. In other words, Buck's claim was based on Saldano (a 2000 case). After Buck was decided, Rayford filed the instant subsequent writ application, and he alleges that his claim could not have been reasonably formulated before Buck. Logic, however, belies that assertion. If Buck's *920 claim was based on Saldano , and Rayford's claim is based on Buck , then Rayford could have reasonably formulated his claim before Buck . As a result, the Court cannot consider the merits of his subsequent writ application.
Buck is Distinguishable
Buck argued that his trial counsel was ineffective when he introduced testimony from Quijano regarding his potential future dangerousness.[1] According to him, his trial counsel was ineffective because, even though Quijano testified that Buck was not likely to be a future danger, he wrote in a report after his meeting with Buck that Buck had a higher probability of being a future danger due to his status as a black man.[2] Despite knowing this, defense counsel specifically elicited testimony from Quijano that Buck's race was a predictive factor in determining whether Buck would be a future danger.[3] The Supreme Court agreed and held that Buck had been deprived of his Sixth Amendment right to effective assistance of counsel due to his attorney's introduction of Quijano's testimony.[4]
At the punishment phase of Rayford's trial, Dr. Gilda Kessner, a clinical and forensic psychologist, testified on behalf of Rayford that, in her professional opinion, he did not pose a continuing threat to society. In rebuttal, the State called Royce Smithey, the Chief Investigator for the Special Prison Prosecution Unit. On direct examination, he testified in generalities about the prison system, but he did not testify specifically about Rayford.[5]
On cross-examination, the following exchange occurred between defense counsel and Smithey:
[Defense counsel]: So you could have units that were relatively assault free, and some that were disproportionate in the amount of assaults that occurred, correct?
[Smithey]: Yes.
[Defense counsel]: And in fact that's the way it shakes out. Some are relatively assault free and some have way more assaults than the rest of the system, right?
[Smithey]: That's correct.
[Defense counsel]: And there's factors that effect that such as gangs and other things, is that correct?
[Smithey]: Yes, sir.
[Defense counsel]: The racial makeup of the unit is also something that goes to the number of assaults or what have you, is that correct?
[Smithey]: It has a factor on it, even though under general Federal guidelines the racial breakdown of the units are predominantly the same or as close as they can get to it.
According to Rayford, this exchange proves that his attorney was ineffective when he elicited that testimony because it tied the issue of race to violence in prison.
The Supreme Court's decision in Buck , however, was based in part upon the need *921 to treat Buck's case similarly to other cases infected by Quijano's testimony even though it was in a different procedural posture,[6] and I do not read Buck as holding that defense counsel is ineffective for merely allowing a witness to use the word "race" in his or her testimony about future dangerousness. The expert in this case did not tie any likelihood of future dangerousness to Rayford's race. Smithey did not meet personally with Rayford and form a specific opinion about his propensity for violence, nor did he give any opinions about any particular race or how race factored into the violence in prison. Unlike Quijano's testimony in Buck , this response was not "potent evidence" that "appealed to a powerful racial stereotype."[7]
The facts of this case do not present the "perfect storm" that the United States Supreme Court addressed in Buck. The Court properly dismisses Applicant's subsequent application for habeas corpus relief and denies his motion to stay his execution. With these thoughts, I concur.
Alcala, J., filed a dissenting opinion in which Walker, J., joined.
"Some toxins can be deadly in small doses." Buck v. Davis , --- U.S. ----, 137 S.Ct. 759, 777, 197 L.Ed.2d 1 (2017). Even brief improper testimony injecting racial bias into a jury's deliberations may infect the fairness of a trial proceeding. See ids="12609620" index="14" url="https://cite.case.law/s-ct/137/759/">id. Accordingly, it is unconstitutional to carry out a death sentence that was imposed on the basis of a powerful racial stereotype-that of black men as " 'violence prone.' " Id. at 776. Relying on the Supreme Court's very recent decision in Buck , William Earl Rayford, applicant, challenges his sentence of death for capital murder by arguing that the jury rendered its decision on punishment by improperly considering racially inflammatory evidence suggesting that race is a relevant factor that may be used to predict whether a defendant is likely to engage in violence while incarcerated. Applicant, who is African American, contends that he was prejudiced by his attorney's decision to introduce this evidence. I agree with applicant that this Court should stay his impending execution to permit him to litigate this claim with evidence and arguments to be evaluated by the habeas court on remand. Instead, this Court's majority order refuses to stay applicant's execution that is scheduled to occur in four days, and it declines to allow any substantive litigation of any kind on applicant's claim. I, therefore, respectfully dissent.
I. Analysis
In his instant post-conviction habeas application, applicant asserts that his counsel rendered ineffective assistance at the punishment phase by eliciting testimony from a State's expert witness suggesting that race is a factor that increases the likelihood of an offender engaging in violent behavior while incarcerated. Relying on the Supreme Court's reasoning in its recent Buck decision, applicant contends that this type of conduct by defense counsel constitutes per se deficient performance. He further contends that he was prejudiced as a result of counsel's conduct, given that this inflammatory testimony was directly relevant to the primary question before the jury at sentencing, applicant's future dangerousness. Viewing the record as a whole, applicant contends that, as a result of this racially charged testimony and the State's closing argument, "[t]he jury was told that some prison units are much more violent than others, that the racial makeup of the unit impacts the amount of violence within, and that people *922 like [applicant]-a black man-are the cause of that violence." I agree with applicant at least to the extent that, in light of the Supreme Court's decision in Buck, this Court should grant him a stay of execution to determine whether Buck provides him with a basis for relief. After I describe the Supreme Court's decision in Buck below, I will explain why I conclude that the reasoning of that case compels us to stay his impending execution.
A. The Supreme Court's Decision in Buck v. Davis
In Buck v. Davis , the Supreme Court considered whether Buck, who had been sentenced to death in Texas for shooting his girlfriend and two others, was entitled to federal habeas relief on the basis of ineffective assistance of counsel due to counsel's decision to elicit racially inflammatory testimony from an expert witness. 137 S.Ct. at 767. In Buck , the Supreme Court repeatedly emphasized the principle that race has no proper role whatsoever in capital sentencing determinations. It stated, "Our law punishes people for what they do, not who they are. Dispensing punishment on the basis of an immutable characteristic flatly contravenes this guiding principle." Id. at 778. The Court observed that the principal issue at the punishment phase of Buck's trial was whether he was a future danger, in the sense that it was probable that he would commit criminal acts of violence that would constitute a continuing threat to society. Id. at 767-68. Defense counsel for Buck called an expert, Dr. Quijano, to testify that Buck was not a future danger to society. In his written report, Dr. Quijano had included an analysis of seven statistical factors for assessing future dangerousness, one of which was race. Id. at 768. Dr. Quijano's written report stated, "4. Race. Black: Increased probability. There is an over-representation of Blacks among the violent offenders." Id. Consistent with his written report, Dr. Quijano testified in response to questioning from defense counsel, "It's a sad commentary that minorities, Hispanics and black people, are over represented in the criminal justice system." Id. at 769. On cross-examination, the prosecutor also questioned Dr. Quijano about the role of race in assessing Buck's future dangerousness. She stated, "You have determined that the sex factor, that a male is more violent than a female because that's just the way it is, and that the race factor, black, increases the future dangerousness for various complicated reasons, is that correct?" Dr. Quijano answered, "Yes." Id. Later, during closing argument, the State referenced Dr. Quijano's testimony, stating, "You heard from Dr. Quijano ... who told you that ... the probability did exist that [Buck] would be a continuing threat to society." Id.
In assessing the merits of Buck's ineffective-assistance claim, the Supreme Court first held that counsel's performance fell outside the bounds of competent representation. Id. at 775. The Court reasoned that, although counsel was aware that Dr. Quijano's report reflected his view that Buck's race disproportionately predisposed him to violent conduct, counsel nevertheless "(1) called Dr. Quijano to the stand; (2) specifically elicited testimony about the connection between Buck's race and the likelihood of future violence; and (3) put into evidence Dr. Quijano's expert report that stated, in reference to factors bearing on future dangerousness, 'Race. Black: Increased probability.' " Id. Given that the principal inquiry before the jury was whether Buck posed a future danger, the Court reasoned that counsel had erred by introducing into evidence a report that "said, in effect, that the color of Buck's skin made him more deserving of execution." Id. The Court concluded that no competent defense attorney would introduce *923 such evidence about his own client. Id.
Regarding the prejudice prong, the Supreme Court concluded that Buck had made the requisite showing of prejudice by demonstrating a reasonable probability that, without Dr. Quijano's testimony, at least one juror would have harbored a reasonable doubt about whether Buck was likely to be violent in the future. Id. at 776. The Supreme Court emphasized that Dr. Quijano's testimony was directly relevant to the key issue at Buck's punishment trial-whether Buck was likely to be a future danger. Id. The Court reasoned that, absent Dr. Quijano's testimony, a jury could have reasonably determined that Buck would not be a future danger while incarcerated in light of the fact that all of Buck's violent acts had occurred outside of prison and within the context of romantic relationships unlikely to occur in prison. Id. But, by adding Dr. Quijano's testimony into the equation, the jury was invited to consider a characteristic of Buck that would not change when he was in prison-the color of his skin. Id. The Court reasoned,
[A]ccording to Dr. Quijano, that immutable characteristic carried with it an "[i]ncreased probability" of future violence.... And it was potent evidence. Dr. Quijano's testimony appealed to a powerful racial stereotype-that of black men as "violence prone." In combination with the substance of the jury's inquiry, this created something of a perfect storm. Dr. Quijano's opinion coincided precisely with a particularly noxious strain of racial prejudice, which itself coincided precisely with the central question at sentencing. The effect of this unusual confluence of factors was to provide support for making a decision on life or death on the basis of race.
Id. The Court went on to reject the federal district court's conclusion that the introduction of any mention of race in Buck's case was non-prejudicial because it was "de minimis ." Id. The Court stated,
[W]hen a jury hears expert testimony that expressly makes a defendant's race directly pertinent on the question of life or death, the impact of that evidence cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses.
Id. at 777. Concluding that Buck was entitled to relief, the Court remanded the case to the lower appellate court for further proceedings consistent with its decision. Id. at 780.
B. A Stay of Execution is Proper to Fully Consider the Impact of Buck
Having reviewed applicant's pleadings, I conclude that a stay of execution is proper so that this Court may fully consider the impact of the Supreme Court's recent decision in Buck . I, therefore, would grant applicant a stay of execution so that all of his claims and the State's response may be methodically considered in light of the entire record and complete legal analysis rather than hastily rejected without further briefing or evidentiary review.
In response to expert psychological evidence from the defense that was introduced at the punishment phase of applicant's capital murder trial, the State presented rebuttal testimony from Royce Smithey, the Chief Investigator for the Special Prosecution Unit. Smithey was qualified to testify as an expert on the subject of prison violence. Smithey testified that it was his job to investigate any felony offenses that are committed within the prison system. Smithey provided general statistics from the Texas Department of Criminal Justice about *924 the frequency of violent crime committed in prison populations. The overall thrust of Smithey's testimony was that the rate of assaultive behavior by inmates is very high and that inmates have many opportunities to engage in violence. On cross-examination, applicant's counsel clarified that the statistics Smithey had cited were for the prison system as a whole and did not differentiate between the different TDCJ units. Smithey agreed that some units have very few assaults while others comprised a disproportionate amount of the reported assaults. Trial counsel pointed out, and Smithey agreed, that this could be explained by certain factors, of which one factor was the racial makeup of the prison unit, and counsel further suggested that some units were more violent due, in part, to the race of the inmates. The following exchange occurred between Smithey and applicant's counsel:
[Counsel]: So you could have units that were relatively assault free, and some that were disproportionate in the amount of assaults that occurred, correct?
[Smithey]: Yes.
[Counsel]: And in fact that's the way it shakes out. Some are relatively assault free and some have way more assaults than the rest of the system, right?
[Smithey]: That's correct.
[Counsel]: And there's factors that effect [sic] that such as gangs and other things, is that correct?
[Smithey]: Yes, sir.
[Counsel]: The racial makeup of the unit is also something that goes to the number of assaults or what have you, is that correct?
[Smithey]: It has a factor on it, even though under general federal guidelines the racial breakdown of the units are predominantly the same or as close as they can get to it.
In closing argument, the State highlighted Smithey's testimony by arguing that prison assaults are common because "people like [applicant] have the opportunity to commit violence" while incarcerated.
In his pleadings, applicant contends that his case is analogous to Buck because, as a result of his own attorney's conduct, the jury was invited to consider his race in assessing his future dangerousness. Relying on Buck , applicant asserts that Smithey's testimony "appealed to a powerful racial stereotype-that of black men as 'violence prone.' " See Buck , 137 S.Ct. at 776. Given that the primary question before the jury at sentencing was whether applicant was a future danger, applicant asserts that his attorney's conduct in eliciting that testimony was ineffective. He further asserts that he was prejudiced as a result of counsel's error because of Smithey's testimony.[1] Applicant argues that *925 he, like Buck, is an African American man whose punishment-phase evidence included improper references to race as a factor that can make one more prone to violence, and that at least one juror may have found that he was not a future danger under the facts that show only a history of domestic-violence types of crimes unlikely to occur while in prison.
I do not make any attempt to resolve the ultimate merits of applicant's claim at this juncture. Perhaps it could be suggested that Smithey's testimony did not prejudice applicant because it was too general in nature to draw on any prejudicial racial stereotyping. In my view, however, that determination should be made only after a remand to the habeas court for an assessment of the tenor of the testimony and its probable impact on the case as a whole. Permitting an execution to proceed when there is an arguably valid claim that improper racial bias could have led to the imposition of a death sentence is not one that Texas should have an interest in enforcing at this juncture until the claim can be fully evaluated on its merits. As the Supreme Court acknowledged in Buck , the people of Texas "lack an interest in enforcing a capital sentence obtained on a so flawed basis." Id. at 779. The seriousness of the allegations here warrant a closer examination of this issue before applicant's execution may properly be carried out.
It is arguable that applicant cannot overcome the procedural bar against subsequent habeas applications, but I respectfully disagree with that determination. At this pleadings stage for applicant's subsequent habeas application that was filed only a few days ago, it appears to me that he has made a preliminary showing that his reliance on the new Supreme Court decision in Buck is a proper basis for considering his claim of ineffective assistance due to counsel's error in eliciting racially charged testimony at sentencing. As applicant notes, Buck is arguably a new legal basis for granting him habeas relief, given its holding that even a slight injection of race into a jury's sentencing determination may prejudice a capital defendant when the central inquiry in the case is the defendant's future dangerousness. See id. at 777. Although applicant's claim of ineffective assistance of counsel could have been filed before now, this particular legal theory that even a small dose of the improper racial-prejudice toxin could result in a new capital sentencing hearing was not fully recognized until Buck . But even assuming that Buck is not new law, I would hold that there are other reasons that this Court should hold that applicant can overcome the procedural bar.[2] See, e.g., Ex parte Buck, 418 S.W.3d 98, 99, 113-14 (Tex. Crim. App. 2013) (Alcala, J., dissenting) (stating that, "when an applicant's statutory entitlement to minimally competent *926 assistance of habeas counsel has been denied, and where such denial has led to the forfeiture of a substantial claim for relief, this Court should declare the initial filing improper and adjudicate the claim on the merits"). In any event, I agree with applicant at least to the extent that this Court should (1) stay this execution to permit the habeas court to hear evidence as to his claim and (2) file and set this application to determine whether applicant can overcome the ordinary procedural bar for subsequent habeas applications, and if he can, then to decide whether his claim is meritorious.
II. Conclusion
I would grant applicant's motion for a stay of execution in order to fully examine his claim that his attorney rendered ineffective assistance by eliciting testimony that injected race into the jury's sentencing determination. I, therefore, respectfully dissent from this Court's denial of the stay of execution and dismissal of the application.

Unless otherwise indicated, all future references to Articles are to the Texas Code of Criminal Procedure.

--- U.S. ----, 137 S.Ct. 759, 768, 197 L.Ed.2d 1 (2017).

Id. at 768 (The report read in relevant part "4. Race. Black: Increased probability. There is an over representation of Blacks among the violent offenders.").

Id. at 768-69.

Id. at 777.

He said that murders and escapes happened even on death row. And he testified generally to the number of assaults that occurred in the system, major disciplinary actions, minor disciplinary actions, and opportunities inmates had to engage in violence against staff or each other.

Id. at 779.

Id. at 776.

Without considering the substantive merits of applicant's claims, I note that, while the injection of race into the future-dangerousness special issue in Buck was arguably more egregious, it is unclear at this time how much is too much. In Buck , the Supreme Court found it irrelevant that the injection of racial prejudice constituted only a few lines of testimony in an otherwise lengthy record. The Supreme Court found that, based on the timing of the testimony, which was at the same point as in this case, and the fact that the testimony came from an expert witness, Buck was prejudiced by this brief but potent reference to his race. In essence, the Supreme Court found that, despite the minimal reference to race, the testimony had created an impermissible inferential chain: Black men are over represented in prison, that over representation in prison signifies an increased propensity for violence, and therefore, Buck was more deserving of death. Owing to the recency of Buck , the contours of evaluating prejudice for these types of claims remains unsettled at this juncture. Accordingly, this Court should grant the stay to address the proper approach to evaluating harm due to improper references to race in this context.

Alternatively, as applicant has argued, this case again presents this Court with the opportunity to overrule its precedent in Ex parte Graves and permit the litigation of a claim that was forfeited in the initial habeas proceeding due to incompetence by appointed habeas counsel in failing to raise it. See Ex parte Graves, 70 S.W.3d 103, 117-18 (Tex. Crim. App. 2002) (holding that capital habeas applicant's claim of ineffective assistance of prior habeas counsel is not cognizable in a capital habeas proceeding and may not serve as a basis to consider a claim raised in a subsequent writ). Though I recognize that this Court has, to date, declined to apply any kind of exception to its procedural rules on the basis that habeas counsel erred in the initial proceeding by failing to raise a substantial claim, I continue to believe that this Court should excuse a capital habeas applicant's procedural default under those circumstances and permit the claim to be litigated on the merits.