# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE
NEWS RELEASE #031

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **27th day of June, 2025** are as follows:

**PER CURIAM:**

2024-KP-00267      *STATE OF LOUISIANA   VS.   BRHIAN THOMAS (Parish of Lafourche)*

REVERSED AND REMANDED. SEE PER CURIAM.

Weimer, C.J., additionally concurs and assigns reasons.
Hughes, J., concurs in the result.
Crain, J., dissents and assigns reasons.
McCallum, J., dissents.

SUPREME COURT OF LOUISIANA

No. 2024-KP-00267

STATE OF LOUISIANA

VS.

BRHIAN THOMAS

On Supervisory Writ to the 17th Judicial District Court, Parish of Lafourche

**PER CURIAM**

We granted writs to examine whether the district court correctly denied post-conviction relief. After considering the evidence and arguments, we find it erred in denying relief on some of the ineffective assistance of counsel claims. We therefore reverse the district court's judgment, vacate the conviction and sentence, and remand for a new trial.

A Lafourche Parish jury found the applicant guilty of second degree murder for the shooting death of Deeric Raymond during a confrontation on September 4, 2017, just after 1:00 a.m., outside the applicant's home in Thibodaux. Deeric showed up there with his brother Javonnie to collect a debt from applicant's romantic partner, Tarisha Thomas (no relation), and to exchange custody of the young child Javonnie shared with Tarisha. After a physical altercation involving all three men, Deeric died of a single gunshot wound. Applicant's identity as the shooter has not been disputed. Rather, the central issue for the jury at trial was whether the applicant acted justifiably in shooting Deeric or if the applicant was the initial aggressor in the conflict and therefore not entitled to use lethal force. After hearing the State's case, which centered on Javonnie's testimony recounting the events, the jury rejected applicant's justification defense and found him guilty as charged.

The trial court sentenced him to the mandatory term of life imprisonment at hard labor without parole. The court of appeal affirmed, finding sufficient proof that applicant did not justifiably shoot Deeric. *State v. Thomas*, 19-0817 (La. App. 1 Cir. 1/9/20) (unpub'd, available at 2020 WL 104678), *writ denied*, 20-0250 (La. 5/14/20), 296 So.3d 614.

Applicant timely filed claims for post-conviction relief, now at issue. After two days of evidentiary hearings at which the applicant and others testified, the district court denied relief because it found "no new evidence was presented" and "no showing [] that the Jury would have reached a different verdict based on the evidence and testimony presented." The court of appeal denied writs without explanation, *see State v. Thomas*, 23-1224 (La. App. 1 Cir. 1/30/24) (unpub'd), and applicant sought review.

As discussed below, we find some of the ineffective assistance of counsel claims have merit. The evidence at trial centered on Javonnie's testimony that his brother Deeric was shot as he was running away from the applicant, and the defense called no witnesses to show otherwise. At the post-conviction hearing, however, applicant took the stand to tell his version of the events. Applicant testified that he fired his gun as he was being attacked by the two brothers (Deeric weighing much more than him) outside his home in the middle of the night, and that he wanted to explain his actions to the jury but was told by his trial attorney it would be a mistake to do so—and he went along with that advice. He also supported his post-conviction claims with a new forensic expert opinion and records disclosed in discovery which he argued trial counsel should have used to impeach Javonnie and cast doubt on the testimony that Deeric was shot as he ran away.

We agree with the applicant that the evidence shows his trial attorney acted unreasonably by failing to utilize records provided in discovery to cross-examine Javonnie, by failing to consult a forensic expert, and by failing to call the applicant

2

to testify as a witness on his own behalf. We also agree that the impact of these errors caused prejudice.

"The Sixth Amendment, applicable to the States by the terms of the Fourteenth Amendment, provides that the accused shall have the assistance of counsel in all criminal prosecutions." *Missouri v. Frye*, 566 U.S. 134, 138, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012). The United States Supreme Court has long recognized that the right to counsel is the right to the "effective assistance of counsel." *Frye*, 566 U.S. at 138, 132 S.Ct. 1399. Claims of ineffective assistance of counsel are governed by the two-part standard in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which this Court adopted in *State v. Washington*, 491 So.2d 1337 (La. 1986).

To prevail on such a claim, a defendant must first show that his "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. To satisfy *Strickland*'s second prong, a defendant must demonstrate prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error has no effect on the judgment." *Strickland*, at 691, 104 S.Ct. 2052. *See also Buck v. Davis*, 580 U.S. 100, 118–20, 137 S.Ct. 759, 775–77, 197 L.Ed.2d 1 (2017) (explaining the two prongs of *Strickland*). "The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052. Thus, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. The *Strickland*

3

Court further explained that in assessing the effectiveness of counsel, "[i]n every case the Court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696, 104 S.Ct. 2052. *See also Harrington v. Richter*, 562 U.S. 86, 111–12, 131 S.Ct. 770, 792–93, 178 L.Ed.2d 624 (2011) ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is reasonably likely the result would have been different.") (internal citations and quotation marks omitted). Put another way, "the likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112, 131 S.Ct. 770.

While fully acknowledging that the bars are high, we disagree with the State's characterization in the instant case of the *Strickland* prejudice prong as demanding proof the outcome would have been different. In doing so, the State advocates a standard more onerous than what the settled law demands. *Strickland*'s roots take hold in the same ground as the *Brady* jurisprudence,[1] and do not require a defendant to make a definitive showing that the outcome would have been different absent the error(s). *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112–113, 96 S.Ct. 2392, 2397, 2401–02, 49 L.Ed.2d 342 (1976)). Rather, we ask whether, but for any proven error, there exists a reasonable likelihood of a different outcome. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair,

---

[1] The familiar materiality standard of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), is identical to the *Strickland* prejudice test. *See* 466 U.S. at 694, 104 S.Ct. at 2068 (citing *United States v. Agurs*, 427 U.S. 97, 104, 112–113, 96 S.Ct. 2392, 2397, 2401–02, 49 L.Ed.2d 342 (1976)); *see also Johnson v. Scott*, 68 F.3d 106, 109–10 (5th Cir. 1995).

4

even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome."). As discussed below, the district court erred in this case by adopting the State's more burdensome interpretation and denying some of the claims here.[2]

Due to the fact-intensive nature of the issues at hand, a summary of the evidence presented at trial is useful. The testimony presented for the jury indicated that Tarisha was simultaneously dating both the applicant and Javonnie, and that both men knew as much at the time.[3] As noted above, Javonnie and Tarisha had a three-year-old son together, but at the time of the shooting Tarisha and the applicant had been living together in applicant's home for about a year. Tarisha and Javonnie's son was there with Tarisha and the applicant on the night of September 4, 2017, when Javonnie Raymond and his brother Deeric Raymond, the decedent herein, arrived at around 1:00 a.m., after a night out.

Javonnie and Deeric had been gambling at a casino after attending a family party. Javonnie testified that his purpose for the 1:00 a.m. visit to the applicant's home was to pick up his young son and get a large sum of money that Tarisha owed him.[4] He claimed they agreed ahead of time that he would pick up his child at 1:00 a.m. In contrast, Tarisha testified that Javonnie was not expected to come over at that late hour, and that they had never done child exchanges at such odd times.

Javonnie told the jury that he "knocked" on the side of the trailer to announce his arrival. Applicant awoke and came outside to see who was there. Javonnie

---

[2] Because the district court's ruling on the ineffective assistance of counsel claims involves mixed questions of fact and law, it is subject to our *de novo* review. *See State v. Hunt*, 09-1589 p. 6 (La. 12/1/09), 25 So.3d 746, 751; *State v. Hampton*, 98-0331 p. 18 (La. 4/23/99), 750 So.2d 867, 884.

[3] Tarisha testified that the applicant and Javonnie both knew she was romantically involved with them at the same time. According to Tarisha, she and Javonnie had agreed to part ways three or four days before the incident at issue but were still in contact. She also testified that, at some point, she told Javonnie she had stopped seeing the applicant and was single.

[4] Tarisha testified that Javonnie had loaned her "about $2,000" to buy them a mobile home. According to Javonnie, he gave her $2,500 to purchase a trailer for them to live in together, but he asked for the money back after she failed to buy it as agreed upon.

5

testified that because it was dark, he did not see anything in the applicant's hands. Soon thereafter, Tarisha woke up and came outside. According to her trial testimony, applicant had his gun in his hand at this point.

According to both Javonnie and Tarisha, they were standing outside talking together with the applicant. Initially, nobody was upset. But when Tarisha told Javonnie that she was no longer dating applicant, Javonnie testified that the applicant became angry. According to Javonnie, applicant hit him in the face and knocked him down. In contrast, Tarisha testified that she did not see who threw the first punch.

Javonnie testified that the applicant tackled him with such force that it dislocated his shoulder and rendered him unable to defend himself. As a result, Javonnie told the jury that he quickly retreated into a covered position but that the applicant "kept swinging." Javonnie said he called out to his brother for help. Deeric got out of their parked car and tackled the applicant. Javonnie claimed he did not re-engage in the fight because his shoulder was dislocated. According to Tarisha's testimony, however, at this point both Javonnie and Deeric were fighting applicant, two against one.

According to Javonnie's testimony, Deeric tried to back away, but Javonnie heard the applicant ask Tarisha for his gun. Javonnie testified that he heard applicant "rack the gun" and so Javonnie took off running. When he looked back, Javonnie testified he saw applicant shoot Deeric as Deeric stumbled while also running away.

In contrast, Tarisha told the jury that she stayed in the midst of all three men as they continued tussling, and that she was still trying to break up the fight and was nearly face-to-face with Deeric at the moment he was shot. She testified that she did not see the manner in which the gun was fired, however.

As for the surrounding circumstances, Javonnie testified that he had only had a beer or two earlier that day, because he does not drink when he gambles, and that his shoulder became dislocated when the applicant tackled him. Javonnie described

the applicant's weapon as a black handgun, which he said he did not see until the moment the applicant fired. Javonnie kept running and claimed the applicant briefly chased after him. Javonnie found a place to hide and eventually his cousin picked him up and took him to the hospital, where he spoke with the sheriff's investigators and underwent shoulder surgery.

Deeric Raymond succumbed to injuries caused by a single gunshot wound. Dr. Marianna Eserman told the jury that the bullet entered through his right upper back, traveled forward and downward, and came to rest in his left pelvis. There was no stippling on his skin, which Dr. Eserman said indicated the gun was at least two to three feet away from his body when it was fired. Deeric's clothing was not tested for gunshot residue. Dr. Eserman also testified that Deeric's toxicology screen was positive for methamphetamine (280 ng/mL), amphetamine (38 ng/mL), marijuana, alcohol, and nicotine.

At the scene, applicant falsely informed police that the shooter fled. As more people started to gather there, including several of the Raymonds' relatives, applicant left on his own.[5] After being questioned at the scene, Tarisha identified the applicant as the shooter, and she was taken in for further questioning. Two days later, on September 6, the applicant surrendered himself to law enforcement.

The defense did not call any witnesses at trial.

To support his claims for post-conviction relief, the applicant testified at the evidentiary hearing. He acknowledged his two prior convictions for controlled substances and verified he had no prior violent offenses. As for the events in question, he testified contrary to Tarisha's trial testimony that he believed at that time that she and he were in a faithful, monogamous relationship and that he did not

---

[5] Testimony at trial established that the scene quickly became chaotic, with multiple individuals arriving soon after first responders, including at least one young man who was yelling and throwing his arms up, trying to intervene and approach the victim. The paramedic who testified, Mr. Lassere, explained the scene felt unsafe as a result of the commotion and number of people congregating.

know she had still been seeing Javonnie. As for Javonnie showing up uninvited at 1:00 a.m., applicant described it as a shock to have a visitor at that hour, after he, Tarisha, and their children had all gone to sleep. According to the applicant, and contrary to Javonnie's trial testimony, Javonnie had only come over to his place to pick up his son once before, and that was at 10:00 a.m.—and planned ahead of time. In contrast, on the night of September 3, 2017, applicant was aware of no plans for Javonnie to come over and was alarmed when the children awoke him, scared by someone pounding on the side of his trailer and peeping into the windows. Out of fear for all their safety, applicant testified that he retrieved his gun from beneath his mattress and went out to see who it was and what they wanted.

Upon recognizing Javonnie, applicant testified that he asked his reason for being there. Javonnie asked to see Tarisha and the applicant went to get her. After the three of them began talking outside, applicant said Javonnie began taunting Tarisha about her living there with the applicant. Not liking his attitude, the applicant told Javonnie to leave and asked Tarisha to go back inside. Applicant turned to follow Tarisha up the steps to go back to bed. After he turned away, applicant testified that Javonnie unexpectedly hit him on the back of his head. Applicant responded by throwing his gun to the ground and fighting Javonnie, "like two men." According to applicant's testimony, Javonnie then called out for his brother and said, "get him Debo." As the applicant explained it, it was now two-on-one, and he soon became tired trying to defend himself against both Javonnie and Deeric.

Applicant explained how he came to shoot Deeric, which account differed materially from what Javonnie told the jury. Applicant testified that he fired his gun only as a last resort while still being attacked by both brothers. After Deeric was shot, applicant testified he enlisted his neighbor Earl Landry to help him get Deeric into the vehicle to take him to the hospital, and said he called out to Javonnie to

8

come back to help, but Javonnie ran and did not return. ("I said, Javonnie, help me get him in the car. And he looked at me and he just took off running.").

As for his departure from the scene, applicant explained that he remained and spoke with police, but he became fearful and left after several of Deeric and Javonnie's relatives arrived angry, because he didn't want any more trouble. Applicant quickly hired defense counsel and, on counsel's advice turned himself in but did not speak to explain what happened. Applicant said he always wanted to tell his side of the story, but that counsel advised him not to and he complied.

Trial counsel's post-conviction testimony verified that he told applicant not to testify. As for counsel's engagement in the matter, applicant disputed counsel's post-conviction testimony that they met and discussed whether he should testify; applicant claimed counsel merely told him he should not testify, without leaving any room for debate.[6]

Based on our review of the trial testimony and what has been adduced post-conviction, we find that counsel made grave miscalculations in handling applicant's R.S. 14:20 justification defense, which was the only viable strategy in this case. More specifically, counsel erred by failing to use Javonnie's initial statement to hospital staff admitting he had used ecstasy and other substances before the 1:00 a.m. confrontation and that, while impaired, he fell off a vehicle and injured his own shoulder. We also find counsel unreasonably failed to utilize Javonnie's initial statement to law enforcement in which he indicated he *heard* the gun fire but did not mention going to applicant's trailer to get his son, which therefore could have been used to impeach Javonnie's trial testimony asserting that he heard *and saw* the shooting and that he had gone there primarily to pick up his son (as opposed to only

---

[6] Applicant's allegation that counsel's performance fell short is bolstered by the jail visit logs which indicate that during applicant's more than year-long pre-trial detention, counsel visited him just three times and that, during the trial, counsel paid him no visits. In addition, counsel did not provide him copies of discovery and he filed just one pre-trial motion: a generic speedy trial motion that was signed by someone other than enrolled counsel.

collecting a debt). Both of his prior statements, which Javonnie made within hours of the confrontation, would have been useful to discredit Javonnie's testimony, which was the State's primary evidence to show that applicant did not act justifiably.

As for counsel's failure to use Javonnie's initial statements at trial, the State suggests that counsel really had nothing to use because the statements were not irreconcilable with Javonnie's testimony. As the State sees it, Javonnie never told investigators he didn't see the shooting, and did not tell hospital staff he was still impaired *during the confrontation*, so his testimony would not have been impacted had the earlier statements been aired. In other words, the State submits that because Javonnie's initial statements were not irreconcilable with his testimony and instead reflected answers to different questions than those put to him at trial, defense counsel did not err.

At the evidentiary hearing, trial counsel conceded that Javonnie's statements to the medical providers and investigators could have been used to impeach his testimony, but counsel did not have any explanation for his failure to use them to expose: (1) whether Javonnie had been using intoxicating substances before his visit to applicant's home; (2) how his shoulder was injured; (3) whether he saw the shooting or only heard it, or (4) why he and Deeric visited at 1:00 a.m.

We see no reasonable justification for these omissions and find that counsel erred unprofessionally in foregoing these points. Contrary to the district court's determination, Javonnie's admitted use of ecstasy (and other substances) earlier that night would have raised reasonable doubts about his demeanor and the accuracy of his perceptions during the relevant timeframe in addition to squarely refuting his testimony implying that he purposefully kept sober that night. Because Javonnie's admitted use of intoxicating substances bears on the central issue of what really happened vis-à-vis who initiated aggressions, counsel erred in avoiding the topic. The statements given to the investigators and hospital staff were disclosed in

10

discovery and counsel unreasonably failed to pursue these avenues when questioning the State's chief witness.

Even if Javonnie's initial statements were not entirely irreconcilable with his testimony, they still reveal significant incongruities between what he initially and more candidly reported, versus what he later told the jury. In this way, it was incumbent upon the defense to use the earlier statements to call into question the veracity of Javonnie's account at trial. Counsel's failure to do so bears directly on applicant's constitutional rights to confront the witnesses against him. *See Davis v. Alaska*, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *State v. Robinson*, 01-0273, pp. 5–6 (La. 5/17/02), 817 So.2d 1131, 1135.[7] The right of confrontation is fundamental because it is "the principal means by which believability and truthfulness of testimony are tested." *Robinson*, 01-0273, p. 6, 817 So.2d at 1135. And although it is not an unfettered right, witnesses may be cross-examined on any matter relevant to issues in the case, including those bearing on their own credibility. *See* La.C.E. art. 611 and La.C.E. art. 607. Subject to the discretion of the trial judge to preclude repetitive and unduly harassing interrogations, a cross-examiner is not only permitted to delve into the witness's story to test his perceptions and memory but is allowed to impeach and seek to discredit witnesses against the defendant. *Robinson*, 01-0273, p. 6, 817 So.2d at 1135.

Considering that counsel's omissions denied the applicant this fundamental right and even granting that neither of Javonnie's initial statements constitute definitive proof that the applicant acted justifiably, we find counsel acted

---

[7] The Sixth Amendment to the United States Constitution guarantees the right of the accused in a criminal prosecution "to be confronted with the witnesses against him." Additionally, the Confrontation Clause of the Louisiana Constitution directly affords the accused the right to "confront and cross-examine the witness against him." La. Const. art. I, § 16; *State v. Casey*, 99-23 (La. 1/26/00), 775 So.2d 1022, 1030, *cert. denied*, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).

11

unreasonably because he failed to use readily available evidence to bolster the justification defense and cast doubt on Javonnie's testimony. First, Javonnie did not initially report what was likely the most crucial detail in his trial testimony: that he saw Deeric get shot after Deeric had begun running away. Instead, Javonnie initially described hearing applicant "rack the gun" at which point Javonnie said he himself took off running. That night he told investigators that Deeric "didn't [think] it was gon' be like that, he thought we were gon' scare [applicant] off." This candid disclosure clearly suggests that Deeric had not withdrawn from aggressions when the applicant fired his gun. In contrast with this initial description from Javonnie, which the jury did not learn about, Javonnie testified differently at trial when he said that both he and Deeric were *already running away when he saw applicant shoot his stumbling brother*. We see no logical explanation for counsel's failure to call the jury's attention to this material discrepancy in Javonnie's accounts. In a case where the accused asserted he acted to defend himself after being attacked outside his home late at night, counsel's failure to confront the prosecution's case in this respect was a momentous omission.

Moreover, Javonnie's statement to investigators also indicates Javonnie did not initially disclose going to applicant's home for the purpose of picking up his child. Javonnie added this detail at trial, and the prosecutor emphasized it in closing as a wholesome reason for the late visit. Had the jury been aware of this inconsistency, they might have reasonably drawn detrimental inferences from the fact that Javonnie first indicated his only purpose was to collect a debt. As applicant avers, the difference between two men visiting at 1:00 a.m. to collect an unpaid debt versus going to pick up a toddler is not an inconsequential one.

This point takes on greater significance when viewed alongside Javonnie's statement to hospital staff revealing that he was using ecstasy and other substances that night. In preparation for his shoulder surgery, he told them that he dislocated his

own shoulder that night when he fell off a vehicle under the influence of at least one controlled substance *before his visit to applicant's home*. The State nevertheless maintains that counsel did not err by failing to exploit this statement because there is no scientific proof that Javonnie was still impaired during the confrontation. The district court embraced this rationale, too. But even without toxicology results for Javonnie, the omission at trial of his statements to the medical providers left the jury no reason to doubt his testimony blaming his injury solely on the applicant and giving the distinct impression that he had intentionally maintained his sobriety that night. We agree with the applicant that Javonnie's admissions of drug use and self-injury might reasonably have called into question the veracity of his whole account. In urging otherwise, the State has ignored the natural influence this information would have had on the jury's assessment of Javonnie's credibility. Instead, the State simply asserts these inconsistencies would not have definitely changed the verdict, which again, is not the correct standard under *Strickland*.

We hold a similar view as to counsel's failure to take reasonable measures to interrogate whether Deeric was shot in the back. Given the paramedics' "Prehospital Care Report Summary," which was turned over in discovery and indicated that Deeric was shot in the armpit, counsel was obligated to use this information to advocate for his client. But it seems he did nothing with it.[8] Instead, counsel could have called an expert to present a counterweight to the State forensic pathologist's opinion. Illustrating the omission, applicant presented post-conviction testimony from forensic analyst George Schiro which indicates the bullet's path was not consistent with Javonnie's description of how Deeric was shot.

At the evidentiary hearing, Mr. Schiro gave the following opinion on the plausibility of Javonnie's description:

---

[8] The paramedic who testified at trial, Mr. Kerry Lassere, did explain that the shot was "[t]owards the back right armpit area, towards the back." But counsel inexplicably failed to cross-examine Mr. Lassere to get any better specificity on the precise location of the wound.

Q: There was testimony at trial that Mr. Raymond was fleeing at the time and that he had stumbled and upon fleeing and stumbling that was when the gunshot was fired, is that consistent with your review of the - - Could that have been an explanation of the trajectory of the bullet wound?

A: *In my opinion, no.* First of all, I don't think the shot was parallel to the ground, the trajectory. Also, that if someone is leaning forward or falling forward and they get shot in that kind of right upper back under arm area, the trajectory would actually be outward anatomically speaking.

(emphasis added).

The State denies that an opinion like this could have impacted the verdict because it says even Mr. Schiro agreed it is possible that Deeric was shot as he stumbled while running away. But even if the expert's opinion leaves room for alternative interpretations of the angles and trajectory, we find it revealing that the State has not acknowledged that Mr. Schiro testified that *it was more likely* that Deeric was *not* shot in the manner Javonnie described.

In rejecting this claim, the district court found Mr. Schiro's opinion substantially the same as that of Dr. Eserman at trial. According to the district court, both testified that the bullet's path was consistent with Deeric being shot as he was slipping and falling. However, it is a mischaracterization to describe Mr. Schiro's opinion as the functional equivalent of Dr. Eserman's. Instead, our review indicates that Dr. Eserman and Mr. Schiro gave different opinions about what they think likely happened. To the extent that an opinion like Mr. Schiro's would have provided a reason to doubt the State's theory, trial counsel erred by not presenting one in a case in which the State had to prove that the applicant did not act justifiably. Given counsel's failure to present an expert (or any witness at all) to substantiate applicant's self-defense theory, counsel erred. The manner in which Deeric was shot was the crux of the controversy, as made crystal clear on appeal.[9]

---

[9] *See State v. Thomas*, 2019-0817 (La. App. 1 Cir. 1/9/20) (unpub'd) ("When the defendant armed himself with the gun and both Deeric and Javonnie began running away, the defendant could not have reasonably felt his life was in danger at this point. While he clearly had no duty to retreat, the

14

Finally, applicant claims that counsel erred by advising him not to take the stand to give his explanation of what happened. As trial counsel has testified and the State notes, we recognize that criminal defendants who have prior convictions, like the applicant, are generally well-advised not to testify. *See* Anthony G. Amsterdam, *Trial Manual 5 for the Defense of Criminal Cases* § 391 ("Counsel may properly urge the defendant that it is unwise or dangerous for the defendant to take the stand[, and] counsel's urging may and should be strenuous."). But our review leads us to find that this case is one in which exercise of sound professional judgment shows a departure from the norm was necessary. The district court rejected this claim because it found that counsel was reasonably concerned about the jury's impression of applicant's criminal record. But in a case in which the automatic penalty was life imprisonment without parole, and the defense was justification, the applicant was the best person to relate his competing perspective and the only one legally entitled to do so.

Considering the high stakes, we find the effect of counsel's miscalculations on this point combined with the errors identified above rendered the verdict unreliable. *See Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064 (requiring a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"). By deciding that the cost of the jury learning about his two prior non-violent convictions outweighed the cost of the jury not hearing the applicant's explanation of how he shot Deeric, counsel's poor advice robbed the applicant of his best opportunity to substantiate the defense. And although it is impossible to discern from a cold record whether the jury would have ultimately credited the applicant's version or Javonnie's, it is clear to us that the applicant's post-conviction testimony provides an alternate explanation for the shooting which

_____

defendant did not need to shoot a fleeing Deeric in order to save his own life."), *writ denied*, 20-0250 (La. 5/14/20), 296 So.3d 614.

directly contradicts—and appears at least as plausible as—Javonnie's account. We therefore find that, but for counsel's multiple errors throughout trial, applicant has demonstrated a substantial and reasonable likelihood of a different outcome. Whereas Javonnie testified that applicant was the initial aggressor who shot Deeric as he tried to flee, which plainly invalidated any justification defense, applicant has testified that Javonnie was the initial aggressor and that both Javonnie and Deeric were still physically pursuing him when he resorted to firing his gun. Because the omitted material would have corroborated applicant's version of events in significant respects, we are bound to vacate the conviction under *Strickland*.

The State asks us not to consider the substance of applicant's post-conviction testimony to decide this claim, but cites no authority for its request, instead simply submitting that applicant's testimony is off the table because he failed to prove he was forbidden from testifying. Although we agree that his standalone "right to testify" claim fails under the governing precedent, *see State v. Hampton*, 00-0522, pp. 14–15 (La. 3/22/02), 818 So.2d 720, 729–30, we see no reason not to consider applicant's sworn post-conviction testimony in connection with his other claims. The district court admitted his testimony under oath at an evidentiary hearing for the express purpose of allowing him to satisfy his burden of proof. La.C.Cr.P. art. 930.2. Considering the parties' conflicting theories, we find counsel unreasonably elected not to call his client as a witness. With a mandatory punishment of life imprisonment upon conviction, counsel's duty to advocate was heightened. This appears especially so considering that when a defendant has raised a justification defense under R.S. 14:20, the state must prove beyond a reasonable doubt that the homicide was not done in self-defense. *See, e.g., State v. Harvey*, 26,613, p. 11 (La. App. 2 Cir. 1/25/95), 649 So.2d 783, 790, *writ denied*, 95-0430 (La. 6/30/95), 657 So.2d 1026. Here, counsel's numerous errors rendered the verdict unreliable because applicant's testimony would have diminished the State's proof on this critical point. Had counsel

16

presented applicant's narrative to counter the narrative Javonnie told, and utilized the other omitted evidence, we find a reasonable likelihood of a different outcome. It is for the jury to weigh competing theories and the jury was precluded from doing so in this case due to counsel's errors. The verdict therefore cannot stand.

Because the district court erred in denying the foregoing claims, we reverse its ruling denying relief, vacate the conviction and sentence, and remand for a new trial.

**REVERSED AND REMANDED**.

**SUPREME COURT OF LOUISIANA**

**No. 2024-KP-00267**

**STATE OF LOUISIANA**

**VS.**

**BRHIAN THOMAS**

*On Supervisory Writ to the 17th Judicial District Court, Parish of Lafourche*

**WEIMER, C. J.,** additionally concurring.

The evidence in this matter indicated that the wound to Deeric Raymond was variously described in the record as under the arm or in the back. A diagram in evidence demonstrates the wound could be described as in the back or under the arm, and both descriptions could be accurate. Viewing an autopsy report does not make anyone a ballistics expert.

This matter is resolved based on the failure of defense counsel to adequately confront the witnesses against the defendant, particularly Javonnie Raymond (Derric's brother), who went to the defendant's home in the middle of the night and instigated a confrontation with the defendant, which ultimately resulted in the death of Deeric. The failure of the defense counsel to expose the contradictory statements of Javonnie and other evidence available as outlined in the majority opinion establishes a new trial is appropriate.

On Supervisory Writ to the 17th Judicial District Court, Parish of Lafourche

**CRAIN, J.**, dissenting.

Defendant shot Deeric Raymond in the back. This is a big problem for his self-defense claim, but the majority all but ignores it. Even more puzzling, the majority seems to believe this critical fact was a legitimate issue at trial. It was not.

A forensic pathologist from the coroner's office performed an autopsy that confirmed Deeric was shot in the back. The pathologist identified the location of the entry wound in Deeric's upper back, detailed the bullet path, and prepared the following diagram, which was shown to the jury and admitted into evidence:



As indicated the bullet entered Deeric's right upper back, traveled down and across his abdomen, and ultimately lodged in his left front hip. The pathologist also showed the jury photographs of the body and pointed out the distinct bullet hole appearing on Deeric's upper right back in the same location identified in the diagram. The

defense's forensic pathologist, who testified at the post-conviction hearing, likewise concluded Deeric was shot in the back.

The majority is not convinced. Rather, it concludes defendant's trial counsel made "grave miscalculations" by, among other actions, "fail[ing] to take reasonable measures to interrogate whether Deeric was shot in the back." According to the majority, defendant's attorney "inexplicably failed to cross-examine [a paramedic] to get any better specificity on the precise location of the wound." I respectfully submit that defendant's trial counsel, like the defendant's expert pathologist, concluded Deeric was shot in the back because a detailed autopsy, *complete with photographs*, irrefutably confirms that fact. Given this objective evidence, trial counsel understandably did not cross-examine a paramedic about the wound location.

The majority's error in failing to accept that Deeric was shot in the back permeates the court's *per curiam* opinion and affects the entire analysis. Nowhere is this more evident than the framing of the "central issue" as "who initiated aggressions." Respectfully, who started the fight is irrelevant if Deeric withdrew from the conflict, which is strongly suggested by the fact he was shot in the back at some distance. *See* La. R.S. 14:21. The central issue is not who was the aggressor; the central issue is how and why defendant shot Deeric in the back.

Deeric's brother, Javonnie Raymond, testified Deeric was shot in the back as he was trying to run away. Specifically, Javonnie testified that when defendant asked Tarisha Thomas for his gun, Deeric and Javonnie began running:

> Deeric take off running this way. Deeric running. Well he fell, he slipped. He slipped . . . . Then I heard the shot. He was trying to get up. He tried his best to get up but next thing you know [defendant] fired the gun.

Javonnie said he was about eight to ten feet away from defendant when he fired the gun. His description of the shooting is supported by objective evidence, primarily

2

the fact Deeric was shot in the back, and by the crime scene investigation that confirmed Deeric's body was located about twelve to sixteen feet from where the spent shell casing was found.

Tarisha Thomas testified she heard but did not see defendant shoot the gun. Contradicting Javonnie's account that Deeric was running away, Tarisha testified the men were still fighting when the shot was fired.

Defendant did not testify on counsel's advice, another grave miscalculation according to the majority, who finds this "poor advice robbed applicant of his best opportunity to substantiate his defense" and "explain. . . how he came to shoot Deeric." While the majority is impressed by defendant's "version of the events," which it finds could have swayed the jury, the court's opinion notably does not share defendant's actual description of how he came to shoot Deeric in the back.

At the post-conviction hearing, defendant said Javonnie started the fight, Deeric joined in, defendant tried to run away, and the men started chasing him. Defendant's alternate explanation gets considerably muddled when he tried to explain how he managed to shoot a man in the back who was purportedly chasing him: "So when I was running, I reached down for the gun and I'm coming up to shoot in the air, he was swinging. So when he said, Man, you shot me." Defendant's attorney pressed him to "explain again just a little bit slower about how you came to fire a shot." Defendant again described the fight but failed to provide any further detail as to how he shot Deeric in the back:

> So I get tired and I push off on [Deeric]. And I'm starting to run so they are running behind me…. Javonnie running straight behind me. [Deeric] coming from the side to block me in. So when I grabbed that gun, I'm trying to come in the air to shot (*sic*), he's swinging. And that's how he got shot under the arm.

Defendant had about six years from the time of the shooting until this testimony to review the details of how it occurred. Given a chance to "tell his side of the story," defendant was unable to provide a coherent or logical explanation of what happened.

3

The objective evidence establishes Deeric was shot in the back, not under the arm, and the bullet traveled down his body, not up in the air. Given the deficiencies in defendant's account, plus his previous criminal convictions and incarcerations, counsel's advice not to testify was reasonable.

The majority also faults trial counsel for not calling "an expert to present a counterweight to the State forensic pathologist's opinion." This is also puzzling because the defense's forensic pathologist who testified at the post-conviction hearing did not disagree with one opinion given by the state's pathologist at trial. The majority nevertheless asserts the two pathologists "gave different opinions about what they think likely happened." This is objectively false. The pathologists agreed on the entry and pathway of the bullet, agreed it was not a contact shot, was likely fired from at least two to three feet away, and the pathway was consistent with a downward shot, meaning the gun was higher than Deeric when fired. The defense pathologist explained that the lack of nitrates on the shirt, which if present would indicate a close range shot, may be due to handling of the shirt since the shooting, but otherwise "yes, [the shot] would be beyond a distance of 3 feet."

Neither expert testified to "what they think likely happened." As explained by the state's pathologist, he can only say what is "possible" based on bullet trajectory and the lack of stippling and nitrates. Along these lines, the defense pathologist was asked if certain scenarios were possible, including whether the bullet trajectory was consistent with Deeric being shot when he was "fleeing and stumbling." The expert said the trajectory is not consistent with "someone [who] is leaning forward or falling forward." The majority cites that testimony to conclude the defense expert testified "*it was more likely* that Deeric was *not* shot in the manner Javonnie described." (Emphasis in original.) Again, this is incorrect. Javonnie did not describe Deeric as "leaning forward or falling forward" when he was shot. Javonnie said Deeric "slipped" and was "trying to get up" when he was shot. The

4

defense expert never testified Deeric was not shot in the manner described by Javonnie. He answered a question premised on facts not in the record. Further, the defense expert confirmed that if Deeric was "upright on his knees then, yes, a downward angle would be possible."

The lack of disagreement between the two pathologists is telling and explains why defendant's trial counsel did not call his own pathologist at trial who, by all indications, would have simply corroborated the state's expert. I find no merit to defendant's argument that his trial counsel should have called a pathologist.

The majority also finds trial counsel erred by failing to use Javonnie's statement to law enforcement to impeach him. Javonnie told the officer that he began running when he saw defendant get a gun and cock it. Javonnie was then asked, "How many times did you *hear* him shoot?" (Emphasis added.) Javonnie replied, "[A]bout two or three times." He and the officer then began talking over each other, with the officer asking "you didn't see" while Javonnie was still answering how many shots he thought he heard. The officer did not repeat the question, and Javonnie never denied seeing defendant shoot Deeric. While this statement may have some limited impeachment value, I do not find its use would have created a reasonable probability of a different outcome. Again, there is no dispute defendant shot Deeric in the back. This is not an identity case. Tarisha Thomas testified the men were still fighting, but the jury obviously rejected that version because it was so inconsistent with Deeric being shot in the back by a bullet traveling in a downward trajectory from at least three feet away.

The same is true for the information in Javonnie's medical records, which indicate Javonnie said he injured his shoulder when he fell off a vehicle at 1:00 a.m. that morning. There is no dispute where Javonnie was at 1:00 a.m. and how he injured his shoulder. The reference to drug use earlier in the day is likewise not enough to create a reasonable probability of a different outcome given the strength

5

of the forensic evidence supporting Javonnie's version of how Deeric was shot. As for Javonnie's reasons for going to the residence, he testified at length about going to the residence to collect the money Tarisha owed him, which in contrast to the majority's description as "a large sum," was only a few hundred dollars at that point.

Defendant shot Deeric Raymond in the back. This was conclusively established at trial and later confirmed by the defendant's own expert at the post-conviction hearing. The experts further agree the bullet traveled on a downward path, back to front, and was likely fired from more than two or three feet away. These facts, which cannot reasonably be disputed at this point, corroborate Javonnie's description of the shooting and significantly undermine defendant's self-defense claim. Based on the strength of this evidence, I see nothing in the post-conviction application that creates a reasonable probability of a different outcome. The trial court and court of appeal correctly denied relief. I would affirm.